Council, please proceed when ready. Good morning, Your Honors. My name is Beth Creighton. I'm here for Plaintiff Appellant Craig Calkins. Could you identify the particular speech that you think was First Amendment-protected speech? I had trouble identifying exactly what speech was supposed to be protected here. Okay. I think that's best set forth in my reply brief, which states that there were actually four instances of protected speech, the first of which was the actual conduct that my client engaged in. Now, that was my first – the first thing that raised a question in my mind is I was looking for the speech and I didn't see it. What I saw instead was conduct that didn't look like expressive conduct. It wasn't like when I point and I'm just using a gesture to substitute for words. Your Honor, I think that that is best described in the case that I cited in my reply brief. Tell me facts right now. It's not so much the law that I'm having difficulty with, it's the facts. I can't identify the speech that's supposed to be protected. Well, here is a situation where my client was given a directive by his supervisor that he felt was both illegal and unethical. He refused to follow the directive. So he says. What's the speech? The directive is his refusal to follow the speech. But he doesn't talk. He just sits there. The man tells him to do something that he doesn't think is the proper thing to do. And he keeps his hands to his side and his lips buttoned. He may be right, but I don't see the speech. Your Honor, the opposition, the fact that he didn't follow the directive is the speech. I mean, if he would have followed the directive, that would have been a totally different situation. Ms. Crane, doesn't he have to somehow communicate that fact or demonstrate to somebody else that that is, in fact, what he's doing in order to try and establish protected conduct, if I guess there is such a thing? He did, in fact, do that. He spoke with both Thompson and Matthews to discuss the fact that Brown had given him this directive to not have Hoffman Construction win the bid. When they, in fact, said that he can't do that, he can't influence the committee, he did not influence the committee. Secondly, when Brown confronted him about it afterwards, saying, look, you did not follow my directive, and I don't appreciate that, when he was very irate, my client stepped up and said, look, you know, I will follow your directives, but I'm not going to do anything illegal or unethical. So there was the intention, you know, the intention was expressed, and also the expression was heard. I don't think you're getting what my problem is. He thinks his boss is telling him to do something unethical, to improperly influence the committee. We'll leave aside for the moment whether he's right or whether his boss is right about what's ethical and legal here. Let's assume that it's unethical and illegal. What I'm looking for is for him to go to the city council or to go to the newspapers and say, my boss told me to do something unethical, to influence the committee improperly, and I have refused to do it. And then the whistleblower plugs in and protects him when his boss tries to fire him for going to the papers and going to the city council. And what I can't find here is the protected speech and the nature of going to the papers and going to the city council. Instead, what I see is his boss tells him, I want you to influence the committee, and he says, gee, I'm not sure it's the right thing to do, and then he doesn't do anything, which may be fine if doing something would be a wrong thing to do. But I'm just missing the next link in the argument, the factual link. Your Honor, based upon the case law in the Ninth Circuit, it's not required for him to go to the press, to go to the city council. It's enough for him to complain about it internally to the city council. Let's analyze each of them. It would help me if we could just take each of your, you know, your arguments as to what you think the speech was. Okay. And brush on them at least lightly. The first argument you're making is that the fact that when he went to the council itself, not the council, when he went to the committee meeting, he didn't follow the directive, you think that's speech? Correct. The problem that I think, that I sense Judge Kleinfeld's having, and I have somewhat of a problem on that as well, is that we know that conduct can be speech, like a case that's long before your time, but when the students during the Vietnam War wore black armbands to school, I think it's a case called Tinker, and the Supreme Court said that conduct, wearing a black armband, was speech. The school couldn't say our dress code prohibits it, or at least it was subject to tests that apply when First Amendment rights could be restricted. The problem, as for just what he did at the meeting, is that it doesn't seem like wearing a black armband, or what Judge Kleinfeld said, pointing across a room, it doesn't seem to be expressive conduct, if he just goes there and follows what he thinks are the rules. So I didn't hear you really answer Judge Kleinfeld's question on that one. I know you've got other arguments, like what he told the two employees, but as for just when he went to the committee, do you have any legal authority that would say that his abiding the regulations, without telling anybody there was a request for what he thought was illegal, is expressive conduct? Well, I think that the case that I cited in my reply brief, where the judicial assistant was instructed by the judge to not give training to people who have not worked on his campaign, and she, in fact, signed up two individuals for training that did not participate in his campaign in objection to that directive. She went against the directive by not excluding the individuals who had not participated in the campaign. And I think that that is extremely analogous to this case, where my client refused to participate in something that he felt was an unlawful and unethical directive from his superiors. She's talking, she's giving a class to this woman that didn't participate in the campaign. It seems to me that your interpretation would give free speech protection if the boss tells the employee, take those construction materials and put them in the trunk of my car. I'm taking them home to work on something in my backyard. And the employee realizes, my boss is an embezzler. I can't do that. And so what he does is he just does nothing. And you would say, that's protected speech.  I mean, if he were to have participated in this, in this directive, I mean, and especially in that situation, he's opening himself up to criminal liability. But that's not the issue, though. The issue we have is whether, in the hypothetical Judge Kline proposes, if he carries  Act. Have I got your argument right? The books or records and puts them into the trunk of the car, whether that's expressive conduct. If he does in fact carry it or if he doesn't? If he does carry it, it's not expressive conduct. Because he's not opposing anything. Okay. But you're saying if he doesn't carry it, then he just does nothing. That's expressive conduct. Yes, it is. If it's, if it is interpreted by the listener as such, and Dan Brown in this case is the listener. He, Dan Brown, made it very clear in his, in his upset after, after the, after Hoffman got the contract award, that he was interpreting my client's refusal to participate in his directive as speech. But he said, did he say that? What I'm saying is that because he was so upset about it, that is evidence that he construed my client's actions as an opposition to his directive. I don't know if that logically follows. But, okay, I understand your argument as to what your client didn't do. What about the statement to the two employees? Your client asked them what to do at the meeting, right? He asked them if he was able to influence the committee in any way, if he was able to follow the directive. I'm sorry to ask the question, but did he ever make a statement to those two employees in words or substance that his supervisor had asked him to influence the committee? I believe that that is in the record, Your Honor. That he did tell them that? Yes. Okay. Where is that in the record? I have to go back and take a look, and perhaps I can do that during the arguments of the county. I was under the impression that he told other employees that he had a request. Yes. He didn't tell them he thought there was anything illegal about it. He did not at that time say that he thought that that request was illegal or unethical. Okay. So then if he didn't say that he thought it was illegal or unethical, and he just said, I've had this request, what do you think is proper conduct at such a meeting? Why would that be an expressive, like an expression of speech if he didn't say anything? Well, I mean, just the context of that situation where he's asking about it. It's like a whistleblower law. It's intended to, like, help someone, protect them if they blow a whistle. But if they have a whistle, but they don't blow it, it doesn't apply. I understand your argument about his conduct is like a silent whistle. The dog that didn't bark. You know, I recognize this, but you're making the best case for your client, which is your job. I just have trouble with viewing the non-actions as directly as an expressive communication. I understand your concern about that, but it's my position that there is an inference that he thought that that was wrong by even asking about it. I don't get it. I mean, just because the boss tells an employee to do something and the employee doesn't do it, you're saying the boss must infer that the employee is expressing disapproval. And it seems to me the boss could just as easily infer laziness, generally oppositional, troublesome personality, an insubordinate individual, all kinds of possibilities, other than that there be something expressive. I know if you watch a movie and you're trying to pick out expressive conduct like Cool Hand Luke, the actor has to ham it up a little bit. If you give her things like Cool Hand Luke and Tinker, you guys are a dating program. You guys are modern advocates, even though we call Newman in. You can't even make salad dressing, right? You can't even make salad dressing. The actor has to ham it up. Like if the boss says, dig a ditch, and the actor doesn't dig a ditch, it's not expressive. But if the actor glares at the boss and he takes his shovel and he puts it down on the ground and he just continues to stand there and glare, then it's expressive. But I can't find anything expressive about your guy. Yeah, I understand your point in that, but you have to look at the totality of the circumstances. Here we have, you know, my client refusing to do what he was directed to do. Thereafter, after his boss … I'm looking at the totality, and frankly, the best I can get out of the totality is his boss tells him to do something. And your fellow, and I don't know if he's right or wrong, he thinks that the boss is asking him to do something improper. I don't know if it's improper, but let's say it is. He doesn't tell his boss, which I would sure appreciate it if I ever told an employee to do something that might be improper. He doesn't tell his boss, I think you've got a problem here. I don't think I can do this. We'll both get in trouble. He doesn't say that. And then he tells these other people at the workplace, the boss told me to do this and such. He doesn't say he thinks it's improper or that they ought to go to the boss or that they ought to figure out how to deal with this or they ought to go to the city council. Nothing. It looks like he's not doing what he's told. He's sneaking around behind the boss. He's doing a lot of idle gossiping, and he's not performing any whistleblowing at all. I understand your viewpoint in this, but I don't think that all of the evidence. I'm not just expressing it as a viewpoint. This is your – I'm telling you what I came to after reading the briefs, but I'm not done after reading the briefs. This is your chance to educate me and show me what I'm missing, because I read the briefs fast and I read them once, and I may have missed something that's critical to your case. So tell me. Well, I mean, if you look at the entire circumstances where he in fact – Dan Brown gets upset about the – what had happened, and my client says, look, I'm not going to do anything illegal or unethical. And right there he's saying, I think that what you told me is illegal and unethical, and I refuse to do it. I didn't see where he said that. It's an implication from – Did he say it or didn't he? He said that he is – he was willing to follow Dan Brown's directive, but he was not willing to do anything illegal or unethical. I should hope not. Tell me where in the excerpts to read what he actually said. Your Honor, I can't give you that site offhand, but it was in his affidavit, which is, I believe, in Volume 2 of the Excerpt of Records. Counsel, help me with a more fundamental problem, and that is what is your evidence that links his termination with this claimed protected activity? Well, Judge Brown, I believe, erred below in her determination that there was no other adverse employment action. Well, don't tell me what she did wrong. Tell me what the evidence was that shows that she was wrong. Right. The evidence is the other retaliatory actions that were made against my client that culminated in his demotion. There was threats of termination. There was micromanagement. Well, but there were other things, right? I mean, there were – he was told to send this payment back, to reject the payment, and he did it with a cover memo that basically Mr. Brown was upset about the tone and the fact that your client ostensibly refused to take ownership of any responsibility and that sort of thing, right? Correct. So is your answer to my question, well, you just have to add everything up and then conclude that that was obviously why they fired him? Because of the complete reversal in how they treated my client after his refusal to carry out this directive, that's what I'm talking about. You know, he had 20 – I guess you're arguing temporal proximity. That's your strongest argument to link the termination with this ostensibly protective conduct, is that it? That is one of my strong arguments. You don't have the admissions by Mr. Brown that that's why it fired him. Correct. Okay? But we do – Nobody ever said that's why he was fired. Correct. Okay. Judge Brown went too far, perhaps, because she wasn't aware of one of our recent cases. As I read her opinion, I thought she relied on the Harrison case, and she felt that the three months – approximate three months between the event and then the termination was not sufficient proximity to give any inference of causation. And our Kosalter case, which I trust you're aware of, recent case, says that you – that one can't reject causation merely from long duration alone. It can't be the only factor. Correct. So I am assuming that the test is really what are the total circumstances. In the total circumstances, is there an issue of fact? Assuming there was some protected activity, which we sort of exhausted that issue, and you earlier on – but, you know, assuming that there is on the causation issue, am I right that we would look at whether there's an issue of fact given the total circumstances? Correct. And I think that one of the – one of our strongest pieces of evidence is my client's 22 years with the county with an exemplary employment record. We have great performance evaluations, including one that was written by Mr. Brown in June of 2000. After all of this comes down with the bidding process, there is a much different view of my client, and including the termination letter – or the – sorry, demotion letter that Mr. Brown wrote, there's a variety of inaccurate facts and lots of allegations that had never been brought up before with my client, you know, including a communication issue that was in direct conflict with the June 2000 evaluation, where he had a great communication style. And there's no support in the record at all that controverts my client's assertions that he was subjected to much more negative treatment after the protected speech than before. Thank you, counsel. The time's expired, but if either of my colleagues have further questions, they'll – I don't have any. Okay. Thank you. Counsel? Good morning, Your Honors. May it please the Court, Jacqueline Weber, appearing on behalf of Multnomah County and Defendant Brown. I would like – I was pleased to hear the questions at the initial – the initiation of this argument about what is the protected speech in this case. And the plaintiff has alleged – I see three, but apparently the plaintiff sees four separate instances of allegedly protected speech. And I would like to go through each one of those, because without protected speech, nothing else in this case has any relevance, because the threshold question is, was there protected speech? And without protected speech, no employment action has any constitutional or whistleblowing protection. So the first protected speech is, of course, the act, if you will, of not following what a plaintiff considered a directive. And in order for that act to be speech, it has to have been understood by someone other than the actor as speech. And in this case, there's no evidence that anyone other than plaintiff understood his refusal, if you will, or the fact that he didn't interfere in the selection committee in any way. When he goes to this selection committee or meeting or whatever, and he just follows the rules, nobody's going to – it's not a statement about anything. That's correct. From the point of view of others, I understand that. I'm more concerned with when he has the discussion with his supervisor, and the supervisor's angry at him for not following his directive. And he says, I'll follow your directives, but I'm not going to do anything illegal. Why isn't a kind of a reasonable inference that a statement in that context, I'm not – I'll do – follow your directives, but I won't do anything illegal. Why isn't that statement reasonably going to be understood by the supervisor as a criticism of his initial request? It's not explicitly saying, I'll follow your directives, but your first – your directive was illegal. But it would carry that kind of implication in normal parlance. It may carry that implication, Your Honor, but in order to be protected speech, it has to – the speech has to have some public import. And an employee stating to his manager that I am willing to do my job within the parameters of ethics and law is not something that has – I understand, but let's go back to the implication, because, you know, you may be conceding too much in a sense, at least on this issue. If you say it may have that implication in normal talk, then, you know, we're dealing here with a summary judgment, aren't we, not a trial? Yes, that's correct. And so all inferences go to the plaintiff. And therefore, if we should take that inference, we should view his conduct with his – his conference with his supervisor as if he had said, I'm willing to follow your directives, but the directive you gave me to influence the committee not to select Hoffman was illegal. If that's a – if that's a permissible or reasonable inference of him saying, I'll follow your directives but won't do anything illegal, then it seems to me we have to sort of view that conversation as if he had said that. If he had said that, would that be protected speech? I don't believe so, no. Okay. Counsel, let's focus on page 268 of excerpt volume 2 so that we'll all be talking about exactly what is alleged. I think Judge Gould's questions focus on that page. I assume you brought with you these materials that you demanded. Okay. We're all interested in your answer to Judge Gould's question. If that's a reasonable – you can read his literal language and – He told me that my position – let's see. He confronted me in the hallway. He restated his position that when he gives me a preference, he expects to deliver that preference, me to deliver that preference. And my response was I would do whatever I could, but would not do anything illegal or unethical. This – this – Now, given the plaintiff – giving all inferences on a summary judgment, couldn't a rational jury decide, he's just saying I'll do my job and I won't do anything illegal, but also on the other end, couldn't a rational jury interpret that to mean I'll do my job, but I won't do anything illegal, implying and what you asked me to do was illegal. That's why I didn't do it. In the context of that conversation, I would argue no, that that inference isn't there, because that – that conversation was more general than simply talking about the – the committee – the result of the committee, which was to award a contract. A rational jury could draw that inference? Isn't that the test that I have to apply as to – as to this element? I'm not saying that I see causation or – there are other issues. Right. If – Just on the question whether there's any speech protected by the – that even invokes the whistleblower statute, could a rational jury interpret that language as – as an implied statement that what you asked me to do was illegal? I would concede that that is, in fact, an interpretation and that a jury could help. If a rational jury could decide that, then – then what's your best argument as to why that would not be protected speech, or would you concede that that's protected speech and now let's talk about causation? No, I would not concede that it's protected speech, because I think that that whether or not he communicates to his boss that he thinks he was asked to do something illegal or unethical does not meet the – the public interest test for – Communicate to someone beyond his boss? He has to communicate to someone else, yes. Okay. All right. Is there any case that says that? Well, there are whistleblowing cases that say that, but not First Amendment cases, no. But – but the issue is whether – in saying that then, whether Defendant Brown responded in any way by saying, if you don't, or I understand what you're saying. And, in fact, there's nothing in the record as to what Brown's response to that was. I'm assuming that Brown didn't say anything then, but the plaintiff's theory is Brown then became more hostile and took adverse employment actions. That's another issue. I don't know if there's any evidence of causation of an adverse employment action when we have this insubordination thing like that. Correct. Okay. Well, before you – I don't want to dominate your time. That's fine. My colleagues are interested. I just had one other question that you might want to address at some point. I read Judge Brown's opinion to rely on Erickson. Yes. The idea that on the causation issue, the timing was just too – so remote being three months. It was analogous to Erickson that no inference could be drawn from proximity. And I read your brief to not really push that. And then I saw Kozolter appears to like take a theory that would make Judge Brown's treatment of this incorrect, I guess. Mm-hmm. Am I right in that in that you couldn't – I do recognize – If we wanted to affirm, for example, we couldn't affirm for the reasons stated by Judge Brown on that issue. We'd have to analyze under Kozolter whether there's an issue of fact of causation. Yes. On the total – is it a totality of circumstances? It is a totality of circumstances, temporal proximity being only one of those. And I think – We won't get to that issue unless we first take a position adverse to your position on the speech. Yes. If we decide that there's no expressive speech, that's the end of it? Yes. Interesting. Yeah, I don't have any – well. And I guess the closest thing we have to speech is him telling his boss, I won't do anything illegal or unethical. Is that right? Well, the only other speech that's alleged – actually, there are, I think, two other items of speech that are alleged. One is the conversation he had with Matthews and Thompson, I believe the name is, the two other co-employees. He tells them, Brown wants me to influence the evaluation committee so that I cannot be selected. And actually, that is not what he tells them. The record reflects that he doesn't identify Brown. Having asked him to do anything, he simply asks the question, is there anything that we can't – that I can do to influence the committee? And the response is no. Can you clarify something for me on that? When I read the case, it looked to me like he was kind of dancing around, making his boss think that he was trying to please his boss, making the other employees think that he was with them. But when I read his affidavit, it looked like – well, I guess he dances around there, too. He says, although I am not certain, I believe I disclosed. Yeah, I guess I don't know exactly what he says he said. Well, actually, in his deposition – and this is page 98 of the excerpt of record – he's asked what he actually said to Jan and Darren, the two other employees. I asked if we could step out in the hallway and I had a question about how much information or what I could do to influence them – them referring to the committee – and it was Dan's preference not to award this contract to Hoffman. So what he expressed to them, according to his deposition testimony, that Dan Brown had a preference. And then further down the page, the question asked is, do you recall if you told them specifically that Dan Brown had ordered you to influence the panel? And he simply says, I may have. I may have is not evidence that he did. And then later on in his affidavit, in support of the memorandum in response to the motion for summary judgment, he again cannot say with any more certainty whether he did or he did not indicate to those two employees that he felt he'd gotten an illegal directive. Incidentally, can you enlighten me on something else? I don't know if it has legal significance or not. My thought was, if I was on the panel and the experienced people in the government office that does this sort of thing had the feeling that Hoffman would or would not be a good choice for the contractor, I would really want the benefit of their experience. I want to know about a potential vendor. Are they a good vendor? Should we use them or not? And I don't understand what's unethical about it. What's unethical? Is it unethical? Is it unethical to have a preference for a particular vendor? Absolutely not. I mean, if the boss of the department says, I think Hoffman should or should not get this contract, either one, why is it unethical to tell the committee that that's the way the head of the department feels? I don't believe it is unethical. As I read the record, though, wasn't the concern not that they were not qualified but that they'd simply received too many other contracts from Multnomah County and that there was a perception that they were always the winner and therefore they needed to? I think there was a perception that they didn't have to work very hard to be the winner because of their past history with the county, yes. And I think that that was that perception that Dan Brown was objecting to. He wanted a more thorough review by the committee of all of the applicants. But is that improper under Oregon law to influence? Certainly not. It's not improper under the Oregon contract law at all. Now, the Oregon contract law isn't part of the evidence in this case, but a public contract law, I mean. But in fact, no, there has to be a selection process. There has to be an open process. But the purpose of the process is for all applicants, all responders to a request for proposal to get full review of their proposal, full and fair review, and then the selection is made. That would include Hoffman. Pardon? And that would include Hoffman. As would all of the others, yes. Yes. So is the evidence that he was motivated by a concern that if Hoffman was always getting the contracts that the public would think that Hoffman was a little too cozy with the county and procurement? I don't think there's any evidence of that in this record, no. We don't have any evidence about anything as to the other bidders? Not in the record, no. So we don't know, like, if someone else was bidding who was like his cousin or somebody of his who he did talk to. I mean, he could have been motivated by legitimate reasons that he thought it would be better to have a different supplier, or he could have been motivated by illicit reasons. We really don't know from this. Well, there is evidence in the record that the motivation he articulated was that he felt Hoffman was getting preferential treatment in the review process instead of having a full and fair review of all the applicants. There is that. Excuse me, Dan Brown, Defendant Brown had that, yes. And there's also evidence. Brown felt like Hoffman was getting too many contracts and wanted to spread it around a little bit. Correct. And your fellow thought Hoffman had it won on points and should get the contract. Not your fellow, the other side's fellow. The plaintiff actually says in the record, and I don't know that I'll be able to find it to point to it specifically for you, and I apologize for that, but he does say in the record that he sympathized with Dan Brown's opinion about Hoffman and that he, in fact, didn't disagree that Hoffman was, in fact, getting more, you know, possibly getting too many contracts. And that's kind of like with Aramark having all the national parks food concessions and whether they went on points or not, somebody thinks, gee, we ought to get somebody other than Aramark in this park. Careful, she may represent Aramark. I don't. I only represent the county. That was the picture I was getting, that nobody ever said there was any bribery or corruption or had a brother-in-law who was competing with Hoffman or anything like that. There is nothing. There is no allegation of any of that in that case. We don't have a record about it. We don't have a record about it. And, you know, since we're not talking about the record and haven't been for the past few minutes, I will tell you that it's not there and it was never raised as an issue in this case that Mr. Brown had some sort of personal preference. The reason I'm pursuing this exploration with you is if I can't find anything in the record that actually shows some sort of corrupt purpose in what Brown was saying, it gives me further difficulty in identifying the public interest of the speech that the plaintiff seeks protection for. And that is exactly my point, Your Honor, that the speech, although it may have inference that Van Brown was upset that he wasn't going to do what he wanted him to do, that there is nothing in the speech of a public nature, a public interest. It's simply one employee telling his supervisor that he's going to do his job and support the supervisor within the bounds of ethics. That's all it is. And that is not a matter of public concern. Could you turn to the third incident before we run out of time? Yes, the third incident. Okay, we've talked. We got through the hallway conversation. We got through the hallway conversation and we've got through the actual committee activity and the conversation with the two employees. I believe the last, so those are the three we've discussed. I believe that the last one that the plaintiff alleges is actually the letter he wrote to Mike Oswald. Letter or e-mail? Letter. A letter he wrote to Mike Oswald in response to the contemplated letter of discipline he received from Van Brown. I believe that that is the fourth item of speech that the plaintiffs are alleging. And that item of speech, too, is not protected speech. I believe it's a 13-page letter and it is in the record, I believe, at SCR 574. And what that letter actually does is indicate that although he had many problems with Mr. Brown's managerial style and that there was quite a bit of upheaval in the department during the year, plus that Mr. Brown was managing prior to this incident, that none of those, that all of that had been happening continually throughout the year and therefore was not in response to any alleged protected speech, but was simply the way he was managing the department. Okay. Assuming that... Oh, and I have, I'm sorry. Go ahead. I was just going to say, assuming that we view his statement to his supervisor that I'm not going to do anything unlawful as some sort of implied expression, you know, as carrying some other implicit statement... Yes. ...that had protection, what's your best argument, kind of in a nutshell, as to why there's no issue of fact as to whether he was terminated or had some adverse employment action as a result of that? Well, he did, he, we have conceded that an adverse employment action occurred, which of course was a demotion. But there's no causation. What's your argument as to why there's no causation, causal link? There's no causal link, there's no evidence of causal link because there was an actual incident, which is the memo... The insubordination. ...the insubordination and the reaction to the insubordination. And there is no evidence that that calling him on the insubordination and then proceeding down the path of discipline in reaction to the insubordination was pretextual in any way. And that is what the plaintiff would have to prove is that that was pretextual and there's no proof of that. It occurred, discipline ensued. Okay. All right. Thank you, counsel. Thank you. Your Honor, could I direct you to the excerpt of the record that you were inquiring about? Just give the site. Okay. The sites are, well, you found the one, the excerpt of the record. Just give us the site. What word? It's 267-666-669-633-642 and 98. 98? Yes. Thank you, counsel. Calkins v. Brown is submitted. Thank you.
judges: Kleinfeld, Gould, Tallman